1                     UNITED STATES DISTRICT COURT

2                      SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4  UNITED STATES OF AMERICA and        .
     THE STATE OF TEXAS,               .

5                               .

                   Plaintiffs,    .

6                             .  Civil Action
     VS.                      .  No. H-18-cv-3368

7                             .
     CITY OF HOUSTON,            .  Houston, Texas

8                             .  February 22, 2019
                             .  4:22 p.m.

9                  Defendant.    .
     . . . . . . . . . . . . . . . . . . . .

10

                    TRANSCRIPT OF PROCEEDINGS

11

             BEFORE THE HONORABLE EWING WERLEIN, JR.

12

                     STATUS CONFERENCE

13

14  APPEARANCES:

15  FOR THE PLAINTIFF UNITED STATES OF AMERICA:

16         Mr. Nathaniel Douglas
           US DEPARTMENT OF JUSTICE

17         Environment and Natural Resources Division
           Environmental Enforcement Section

18         601 D Street NW
           Room 8904

19         Washington, DC 20004
           202.514.4628

20         Nathaniel.Douglas@usdoj.gov

21         Mr. Efren Ordonez
           ENVIRONMENTAL PROTECTION AGENCY

22         1445 Ross
           Dallas, Texas  75202

23         214.665.2181
           ordonez.efren@epa.gov

24

25      PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
    TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

```
 1                        APPEARANCES

 2                        (continued)

 3   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
             Mr. Daniel David Hu
 4           OFFICE OF THE UNITED STATES ATTORNEY
             1000 Louisiana, Suite 2300
 5           Houston, Texas  77002
             713.567.9518
 6           FAX:  713.718.3303
             daniel.hu@usdoj.gov
 7
     FOR THE PLAINTIFF STATE OF TEXAS:
 8           Mr. Phillip L. Ledbetter
             OFFICE OF THE TEXAS ATTORNEY GENERAL
 9           ENVIRONMENTAL PROTECTION DIVISION
             PO Box 12548
10           300 West 15th Street
             MC-066
11           Austin, Texas  78711-2548
             512.475.4152
12           FAX:  512.320.0911

13   FOR THE DEFENDANT:
             Mr. David George
14           Ms. Debra Tsuchiyama Baker
             BAKER WOTRING, LLP
15           700 JPMORGAN CHASE TOWER
             600 Travis Street
16           Houston, Texas  77002
             713.980.6513
17           713.980.1717
             FAX:  713.980.1701
18           dgeorge@bakerwotring.com
             dbaker@bakerwotring.com
19
             Mr. Win Colbert
20           Ms. Tiffany S. Bingham
             CITY OF HOUSTON - LEGAL DEPARTMENT
21           900 Bagby, 3rd Floor
             Houston, Texas  77002
22           832.393.6285
             832.393.6445
23           FAX:  832.596.6624
                   832.596.6259
24           win.colbert@houstontx.gov
             tiffany.bingham@houstontx.gov
25
```

```
 1                          APPEARANCES

 2                          (continued)

 3   FOR THE DEFENDANT:

 4           Mr. Phillip M. Goodwin
             Regulatory Compliance Director
 5           CITY OF HOUSTON - HOUSTON PUBLIC WORKS
             611 Walker Street, 18th Floor
 6           Houston, Texas  77002
             832.395.3075
 7           Phillip.Goodwin@houstontx.gov

 8   FOR THE INTERVENOR BAYOU CITY WATERKEEPER:

 9           Ms. Lauren Ice
             FREDERICK, PERALES, ALLMON & ROCKWELL, PC
10           1206 San Antonio Street
             Austin, Texas  78701
11           512.469.6000
             FAX:  512.482.9346
12           lauren@lf-lawfirm.com

13

14

15   COURT REPORTER:

16           GAYLE L. DYE, CSR, RDR, CRR
             515 Rusk, Room 8004
17           Houston, Texas  77002
             713.250.5582
18

19

20

21

22

23

24

25
```

1                          PROCEEDINGS

2                       February 22, 2019

3              THE COURT:  Let's see, this is Number 18-3368, United

4     States of America and the State of Texas versus the City of

04:25:54   5     Houston; and Bayou City Waterkeeper is Plaintiff intervenor.

6              And let's see -- let's see, who is here for the United

7     States of America?

8              MR. DOUGLAS:  Nathaniel Douglas, your Honor.

9              MR. HU:  Daniel Hu.

04:26:10  10              THE COURT:  Thank you.

11              MR. ORDONEZ:  Efren Ordonez for EPA, your Honor.

12              THE COURT:  For the EPA, all right.  Thank you, sir.

13              And then, who is here for the State of Texas?

14              MR. LEDBETTER:  Phillip Ledbetter, your Honor.

04:26:25  15              THE COURT:  Thank you, sir.

16              For the City of Houston?

17              MS. BAKER:  Debra Baker, your Honor.

18              THE COURT:  Thank you.

19              And for the intervenor?

04:26:36  20              MS. ICE:  Lauren Ice, your Honor.

21              THE COURT:  Thank you.

22              And let's see, who are all the others gathered?

23              MR. GEORGE:  David George, one of the other attorneys

24     for the city.

04:26:48  25              THE COURT:  For the city, all right.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MR. GOODWIN:  Phillip Goodwin for the city.

2          MR. COLBERT:  Win Colbert for the City of Houston.

3          THE COURT:  All right.

4              Well, you-all are trying to make it even since

04:26:58   5  they're all suing you, I guess.

6              Okay.  Now, this is a status conference.  I was

7  urged to have a status conference.  So, this is the status

8  conference.  So, tell me what the status is.  The last I have is

9  a report of February 4th that the parties were very -- well,

04:27:22  10  every time I get a report, they're very close to settlement.

11 But what is the status?  You have more meetings in February and

12 -- and so, where are we, please?

13          Mr. Douglas.

14         MR. DOUGLAS:  Your Honor, Nathaniel Douglas,

04:27:39  15 Department of Justice.

16         THE COURT:  Yes, sir.

17         MR. DOUGLAS:  If I can give the Court a little bit of

18 background on --

19         THE COURT:  Thank you, sir.

04:27:43  20         MR. DOUGLAS:  -- what we're prepared to list in our

21 status reports; but I'd like for the Court to clearly understand

22 how much effort, energy, time, resources the federal government

23 has put into this matter along with the state to bring the city

24 of Houston into compliance with the Clean Water Act.

04:27:59  25              So, we started negotiations with the City of

1   Houston in 2013.  There are two types of violations involved

2   here.  One is what we call sanitary sewer overflow.  This is

3   when transmission pipes that go from people's homes run through

4   the city streets either break or get clogged and water gets

04:28:24   5   discharged from those pipes.

6               THE COURT:  You call these what?

7               MR. DOUGLAS:  Sanitary sewer --

8               THE COURT:  Sanitary sewer pipes?

9               MR. DOUGLAS:  Overflows.

04:28:33   10              THE COURT:  Are they overflow pipes or sanitary sewer

11   pipes?

12              MR. DOUGLAS:  We call them sanitary -- they're sewer

13   pipes, but we call them discharge sanitary sewer overflows,

14   SSOs.

04:28:45   15              THE COURT:  All right.  And these are the ones that

16   come from the homes and resident apartments?

17              MR. DOUGLAS:  Well, the piping that come from -- that

18   run in front of people's homes that transmit sewage from the

19   homes --

04:28:59   20              THE COURT:  Yes.

21              MR. DOUGLAS:  -- to wastewater treatment plants, come

22   from restaurants, come from other locations.

23              THE COURT:  And they go into trunk lines or larger

24   pipes?

04:29:10   25              MR. DOUGLAS:  Yes.  There are smaller and larger

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  piping.

2            THE COURT:  It's that whole system?

3            MR. DOUGLAS:  It's the whole system, what you call --

4            THE COURT:  All right.  And then, the other?

04:29:17  5            MR. DOUGLAS:  Is effluent violations.  The --

6            THE COURT:  And this is where they're putting it into

7  the Bayou or something?

8            MR. DOUGLAS:  The wastewater that comes from the homes

9  that go into the pipes and get transmitted to wastewater

04:29:31  10  treatment plants, that wastewater is supposed to be treated so

11  that some of the pollutants that are in that water are taken out

12  or the city doesn't discharge wastewater that contain pollutants

13  above a certain level per permits issued to the city.  And the

14  city has been discharging wastewater where the limitations on

04:29:54  15  the pollutants have been exceeded.

16            Those are the two types of violations involved in

17  this case.

18            THE COURT:  All right, sir.

19            MR. DOUGLAS:  The federal government --

04:30:02  20            THE COURT:  This is a very big city.

21            MR. DOUGLAS:  It is the fourth largest city in the

22  nation.

23            THE COURT:  So, are you looking at a particular area

24  of Houston?

04:30:13  25            MR. DOUGLAS:  Citywide.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  You're looking at the whole city on this?

2          MR. DOUGLAS:  The city has 39 wastewater treatment

3    plants throughout the city.

4          THE COURT:  39?

04:30:22    5          MR. DOUGLAS:  39.  It also has 6,000 miles plus of

6    sewer lines running throughout the city.

7          THE COURT:  6,000 miles of sewer lines.  All right.

8          MR. DOUGLAS:  So, San Antonio, by comparison, has, I

9    think, about seven wastewater treatment plants.  Houston has 39.

04:30:48   10   So, it's a real large system, and that's one of the reasons why

11   in a few minutes I'll explain to the Court why it's taking so

12   long to get to the point where I think we're about to resolve

13   this case.

14          THE COURT:  All right.

04:31:01   15          MR. DOUGLAS:  So, we started negotiating in roughly

16   2013.  We had numerous meetings, and a lot of time we were

17   spending negotiating was the federal government getting educated

18   on how the system works and discussing with Houston in terms of

19   what are the possible approaches or things that we have to do to

04:31:24   20   address these SSOs and effluent violations.

21          Now, the hurricane came in 2017 --

22          THE COURT:  Hurricane Harvey?

23          MR. DOUGLAS:  Hurricane Harvey.

24          THE COURT:  Yes, sir.

04:31:38   25          MR. DOUGLAS:  We had been negotiating for sometime

1  prior to that point.  We suspended negotiations when Hurricane

2  Harvey came for a year.  We met for the first time after Harvey

3  in August, 2018.  We had a meeting actually in March, 2018, to

4  talk about some of the damage that was caused to the city's

04:32:00  5  sewer system because of Hurricane Harvey.

6              But we did have a settlement meeting in August of

7  2018.  We made significant progress in getting back to defining

8  the issues and trying to come up with solutions to those issues.

9  We filed this complaint in this matter for the two types of

04:32:20  10  violations that I mentioned in September -- on September 20,

11  2018.

12              We asked the Court for a stay at the same time.

13  The Court issued that stay.  Since the Court issued that stay,

14  we've had, at least, four meetings, two days each.  Sometimes,

04:32:42  15  they were day and a half, like, they were two days.

16              We've had tons of, what we call, technical calls

17  where technical folks connected to the city that know the way

18  the city system operates as well as technical persons who work

19  for EPA and who work for the state have all been involved in

04:33:01  20  having telephone calls to talk about fixes to the problems in

21  terms of why these overflow SSOs are occurring and continue to

22  occur and why the city is having effluent violations.

23              THE COURT:  Let me pause a moment, excuse me, sir, to

24  ask how does the State of Texas get into here, this case, then

04:33:24  25  as a Plaintiff also?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1      MR. DOUGLAS:  The city operates the 39 wastewater
2  treatment plants.  And each one of those treatment plants has a
3  permit that's issued by the state.

4      THE COURT:  Do they have permits from the federal
5  government, also?

6      MR. DOUGLAS:  Those permits before 1998 were issued by
7  the federal government.  After 1998 -- 1988 -- 1998, they were
8  issued by the State of Texas.  They're called Texas Pollutant
9  Discharge --

10      THE COURT:  So, pre-1998 they were --

11      MR. DOUGLAS:  Issued by EPA.

12      THE COURT:  EPA?

13      MR. DOUGLAS:  Yes, sir.

14      THE COURT:  And then, after, 1998 --

15      MR. DOUGLAS:  Issued by the State of Texas.

16      THE COURT:  -- the State of Texas issued the permits.

17      MR. DOUGLAS:  And I was talking earlier about the
18  wastewater that's discharged from the treatment plants.  Well,
19  these permits will identify the pollutants that the city is
20  allowed to discharge from these plants.

21          And these permits will set limitations on the
22  amount of pollutants that can be in the wastewater.  And the
23  permits have other requirements, such as regarding sanitary
24  sewer overflows that -- those are not permitted.  They're
25  illegal discharges.  That's stated in both our complaint and

04:33:40 (line 5)
04:33:58 (line 10)
04:34:08 (line 15)
04:34:23 (line 20)
04:34:44 (line 25)

1  Waterkeeper's complaint that these are illegal discharges.

2  So, your Honor, after you issued the stay and --

3  on September 24th, 2018, we truly committed with Houston,

4  Houston committed with the federal government and the state

04:35:11  5  government to work towards the settlement.  And we were

6  continuing settlement talks, not beginning.

7  So, we began to have more focus in our settlement

8  talks; and we had at least three meetings of two days each,

9  numerous conference telephone calls, getting our technical folks

04:35:34  10  for each party together to talk about certain issues.  And we

11  have marched through the requirements of the consent decree.

12  And for the most part, we've been trying to

13  negotiate a consent decree that does two things, and that's

14  what's in the complaint.  And those two things are what can the

04:35:52  15  City of Houston do and, in our view, what must the City of

16  Houston do to stop these illegal discharges both in terms of

17  these effluent discharges from the treatment plants and also why

18  is the city having sanitary sewer overflows throughout parts of

19  the city, what's causing those SSOs, what should be done about

04:36:15  20  them, how can we stop them.

21  So, in crafting a consent decree, we have been

22  focusing on finding mechanisms, programs, procedures, things

23  that we can agree on where the city will implement measures to

24  attempt to address SSO and effluent violations.

04:36:36  25  We do this all the time.  We have various consent

1  decrees with other cities --

2         THE COURT:   In various parts of the country?

3         MR. DOUGLAS:  -- across the country.

4              So, we've had these meetings.  We had our last

04:36:47  5  meeting December 13 -- 12 and 13 in Dallas, Texas, and made good

6  progress in that meeting.

7              I'm not going to go through the elements of the

8  consent decree, but I can tell the Court that one of the

9  problems that the city could be facing in terms of addressing

04:37:07  10  SSOs is some of the piping in the ground is old piping.  This

11  piping burst or there are cracks in it.  There are blockages

12  when things go down the sewer and rags and things like that get

13  into the piping.

14              And so, the consent decree, one of the things it

04:37:27  15  does is it focuses on what steps the city will take to address

16  what we call the condition of its sewer system; mainly, you

17  know, other things happening where piping -- sewer pipes are

18  blocked.  And we are also focusing on things that will be

19  measures the city will take to prevent effluent violations from

04:37:55  20  occurring from the treatment plants.

21              We have identified, for example, in the consent

22  decree a number of things that the city will do, what we call

23  early action measures where the city is going to over a period

24  of several early years, three years or so, implement specific

04:38:13  25  measures to address SSOs and effluent violations; and then,

1   there are longer term measures.

2              So, we have been negotiating in good faith since

3   the Court issued the stay and prior to the time the Court issued

4   the stay; and we have filed three status reports with the Court;

5   and we have said in each one of those reports that the city,

6   state, and the federal government have made progress toward

7   settlement.

8              I can say to the Court today that, because all --

9   each of the parties has been committed to working hard towards a

10  settlement.  The city doesn't want to engage in litigation in

11  this matter because it's going to be costly.  The citizens of

12  Houston will be cheated because of the fixes.  They need to fix

13  these -- the sanitary sewer overflows and effluent violations

14  will be delayed due to litigation.

15             So, that's why we have been pushing hard for a

16  settlement so that we can identify specific steps that can be

17  taken immediately, identify for mid-term, short -- long term

18  that will help address SSOs; and we won't be wasting money on

19  litigation.

20             So, we've been fighting hard to get a consent

21  decree together; and I can say to the Court that -- and we were

22  negotiating today on the few remaining issues.  And I can say to

23  the Court today that, if the Court can imagine hundred page

24  document and if the Court can imagine that in that document

25  there is only one issue that the parties disagree on or have not

1   come to an agreement on but have come close to an agreement on

2   and we're still talking; and that is, in all these cases we

3   require that, based on the number of effluent violations that

4   occur with these 39 treatment plants over the years and based

04:40:10   5   upon the number of SSOs and based upon the formula that EPA

6   uses, we calculate a penalty -- a civil penalty number.

7          So, we are -- we have been discussing what that

8   number should be.  The US has told the City of Houston what that

9   number should be in our view.  Houston is reviewing that number,

04:40:34   10   and my --

11          THE COURT:  Houston is doing what?

12          MR. DOUGLAS:  Reviewing.

13          THE COURT:  Reviewing it?

14          MR. DOUGLAS:  The city -- the penalty number that we

04:40:43   15   have given to them.

16          So, if we can reach resolution on the penalty

17   number and a few maybe --

18          THE COURT:  Where does that -- where does the penalty

19   go?  Who obtains the benefit of that?

04:40:58   20          MR. DOUGLAS:  The civil penalty amount that comes to

21   the federal government goes to the US Treasury.  So, if we agree

22   on a settlement and -- probably half of the settlement amount

23   would go to the State of Texas and half would come to the United

24   States.

04:41:19   25          THE COURT:  Is the money better spent on penalties or

1  on trying to cure all these serious problems that you have

2  described to me?

3          MR. DOUGLAS:  I think the answer is both, your Honor.

4  I think that, one, we have built into the consent decree some

04:41:35  5  measures that the city will take to benefit members of the

6  community.

7          THE COURT:  I imagine that what you're talking about

8  are very expensive things to correct, these SSOs --

9          MR. DOUGLAS:  They are, your Honor.

04:41:49  10          THE COURT:  -- and also the effluent violations.

11          MR. DOUGLAS:  They are, your Honor.  At the same time,

12  we think that money should be spent within the city; and we have

13  built into the consent decree projects that will keep the money

14  in the city in a way.  But the Clean Water Act is very clear.

04:42:08  15  It's a federal law that says that, if you violate that law, you

16  are subject to a civil penalty; and that's what we're applying

17  here.

18          THE COURT:  Does the statute say what the amount of

19  that penalty is?

04:42:22  20          MR. DOUGLAS:  Yes, your Honor.

21          THE COURT:  What is this -- what does the statute say?

22          MR. DOUGLAS:  The penalty has changed over the years

23  due to inflation; but I think before November 2, 2015, the

24  penalty was 37,500 per day per violation.  So, if it was a

04:42:45  25  effluent violation from a plant, 37,500 could attach to that.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          And then after November 2, 2015, that amount was

2    increased by Congress to $50,000, I think, 50,200 or something

3    in that range.  But keep in mind that we expect to -- cases

4    involving municipalities or city governments, EPA has a policy

04:43:16    5    that it applies in terms of determining the penalty.

6          So, if we were to seek a penalty based on the

7    amount that you said for the City of Houston, we'll be talking

8    in the -- probably the hundreds of millions of dollars; but

9    because of EPA's civil penalty policy for local governments like

04:43:36   10   Houston, the penalty would be much, much less.

11        THE COURT:  Well, it would have to be or the city just

12   has to go into bankruptcy because the city doesn't have that

13   kind of money, according to the newspapers.  I'm no authority on

14   this at all.  But just reading the newspapers that, apparently,

04:43:55   15   we -- the city, apparently, has severe budgetary problems as it

16   is, like every big city in the country, I would imagine.

17        MR. DOUGLAS:  Yes.  Once again, we're working with the

18   city in terms of what measures it will take.  We have tried to,

19   where we can, adopt the approach with the city once they do

04:44:17   20   things in a particular way to help the city out in terms of

21   financial issues.

22          But I can say to the Court that the point at

23   which we are now is that we are -- the only thing that separates

24   us is agreeing on a civil penalty.

04:44:33   25        THE COURT:  So, everything else is substantively

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  agreed in terms of the remedial steps?

2        MR. DOUGLAS:  Yes, your Honor.  I think we're in a

3  position now -- and I was hoping coming down here today that I

4  would be able to tell the Court that we have a full agreement,

04:44:50  5  but we have continued to talk about the civil penalty amount.

6  And we're just going to need a little bit more time to come to a

7  conclusion on that number.

8        The government is very committed to resolving

9  this case as soon as we can, whether it's through settlement --

04:45:06  10  and that is the approach we would prefer -- or if something else

11  has to be done to address the violations here.

12        Your Honor, I've been with this case since 2013

13  and maybe before; and I'm convinced, in working with the city

14  and working with the folks at EPA and working with the state,

04:45:24  15  that we can bring this case to a conclusion within a very short

16  amount of time.

17        Two weeks would be the amount of time that I

18  would ask the Court to consider allowing us to complete this one

19  last issue.  I can guarantee the Court that, as of Monday

04:45:44  20  morning and maybe even before, I'll be talking to the city

21  folks, the state about resolving the issue.

22        And it's not like we're getting started.  We both

23  have had -- we've both put proposals on the table.  So, it's a

24  matter of discussing those and bringing them together to

04:46:03  25  something that we agree upon.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  All right.  Thank you very much, sir, for

2     your presentation.

3               Does the State of Texas have anything to add with

4     regard to the Plaintiff's position?

04:46:19   5          MR. LEDBETTER:  Just briefly.  Your Honor asked about

6     -- a question about the State of Texas's ability to be a

7     Plaintiff in the lawsuit and --

8          THE COURT:  I was just wondering what the interest

9     was; and of course, Mr. Douglas made an explanation as to some

04:46:36  10     of the historical aspects of it.

11          MR. LEDBETTER:  Yes, your Honor.

12               It was just -- the State of Texas has a separate

13     set of statutes and regulations that were adopted to implement

14     requirements to the Federal Clean Water Act; and it would have

04:46:50  15     standing on its own right to bring an enforcement action for the

16     very same violations.

17               And in this instance, we have been working

18     cooperatively with the United States to pursue a resolution.

19          THE COURT:  So, whatever it is that Mr. Douglas has

04:47:05  20     told me is in quite a very thick, complicated, I gather, or

21     certainly detailed, I should say, consent judgment.  The state

22     is so far satisfied that that -- all of that is -- will meet its

23     demands, as well?

24          MR. LEDBETTER:  Yes, your Honor.  I'm assuming -- we

04:47:30  25     are -- as Mr. Douglas had indicated, we had hoped today we would

1    be able to come into court and --

2        THE COURT:  Does the state undertake to procure any

3    separate penalty other than what Mr. Douglas has described as a

4    penalty that he thought would be shared with the state?

04:47:46    5        MR. LEDBETTER:  No, your Honor.  It would be split.

6    We would be recovering attorney's fees, but that's the only

7    other monetary relief that would be different from the federal

8    government.

9        THE COURT:  All right.  Anything else?

04:48:00    10        MR. LEDBETTER:  I would just reiterate that, under the

11    State of Texas's authority, just like the federal government

12    authority, we would be pursuing civil penalties for the same

13    violations.  They would be mandated.  And we had hoped that --

14    you know, we thought we were pretty close to being able to

04:48:23    15    provide something to your Honor to report success.

16        THE COURT:  All right.  Thank you, sir.

17        MR. LEDBETTER:  Thank you.

18        THE COURT:  All right.  Ms. Baker, what's the city's

19    position?

04:48:33    20        MS. BAKER:  Thank you, Judge.

21        Well, the city is in agreement with Mr. Douglas's

22    portrayal of our negotiations.  They have been very productive.

23    We appreciate the stay opportunity to finish what has been a

24    complicated, long process.  Our city system is larger than

04:48:52    25    almost anyone in the country, and we have worked on it very

1  hard.

2           The -- we do have one remaining issue that he

3  talked about; and --

4           THE COURT:  You agree that that's the one thing left

04:49:05  5  to be resolved?

6           MS. BAKER:  I do agree, yes.  The city does agree.

7  And we also agree that, as you aptly divined, it's an extremely

8  complicated, large matter in a large consent decree.  It's been

9  heavily engineered with the technical teams from both sides.

04:49:23  10          THE COURT:  Are the -- I might ask -- I could have

11  asked Mr. Douglas, too; but he referred to the technical people,

12  also.  Are these employees of the EPA and of the City of

13  Houston?  Or do you use -- does either side use outside

14  engineers or consultants?

04:49:43  15          MS. BAKER:  That's a good question.  The answer is

16  both.  EPA has technical people on their staff, and they've also

17  had an outside engineering company whose specialty is sewer

18  systems and how waste is dealt with, which is a unique

19  specialty, you might imagine.

04:49:59  20          THE COURT:  And any of these experts are the ones that

21  contributed to the information you lawyers need in terms of what

22  is practicable, what can be done, and how to stage remedial

23  efforts?

24          MS. BAKER:  Exactly.  What kind of fixes, what is the

04:50:14  25  problem.  The city also has technical staff in-house and outside

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  consultants.  So, it's been heavily engineered.  Our negotiating

2  teams each bring ten or fifteen to these meetings.  They're very

3  large.

4                    And just by way of a little background -- they

04:50:32  5  alluded to it -- a lot of the problem is, what they call, fat,

6  oil, and grease.  Houston is a big restaurant city.  It gets in

7  our pipes.  It clogs it up.  People, unbelievably, have managed

8  to put basketballs in the sewer, Barbie dolls.

9            THE COURT:  Basketballs?

10            MS. BAKER:  Diapers.  And that clogs things up.  And

11  our system is old.  I will point out that in the last 30 years,

12  the city has spent close to $3 billion improving the system.  In

13  2016, we finished another billion.  And now, we're starting

14  another upgrade in 2019 as a result of this document.  Because

04:51:08  15  the system is so large, so complex.

16            THE COURT:  Are there bond issues that have been

17  approved by the voters to support that work?

18            MS. BAKER:  I think they have to do a rate study to

19  determine that; and of course, there is a concern on -- impacts

04:51:25  20  on low income residents and how people pay their bills; but

21  that's being worked out.  And that is one of the issues we come

22  down to the last on the penalty.

23                    I will say that the statute --the Clean Water

24  Act, while they have penalties, there is no minimum requirement

04:51:42  25  and that the Justice Department and the enforcing agencies have

1  prosecutorial discretion on penalties.  They've negotiated with

2  different cities all over the country, you know, different

3  amounts of penalties; and that is a negotiated thing.  And so,

4  that is where we are.

04:52:01  5      THE COURT:  All right.  Okay.  And you share -- and

6  maybe you -- I need to -- I know Mr. Ledbetter and Mr. Douglas,

7  I think, indicated that maybe -- they thought maybe in the next

8  couple of weeks.  Do you share that optimism that this can be

9  done within the next couple of weeks?

04:52:26  10      MS. BAKER:  Yes, I am optimistic that it can.

11      THE COURT:  Does it require then action by the City

12  Council?

13      MS. BAKER:  Yes.  Both the government side -- the

14  federal government side and the city will have to -- once the

04:52:40  15  document is something that can be recommended, they all have to

16  go up to their management and recommend it.  So, our City

17  Council and our mayor would have to review it.  My understanding

18  for -- the EPA would have to send it to their senior management,

19  as well.

04:52:54  20      THE COURT:  And what -- and I can come back to

21  Mr. Douglas if he wishes to speak on this.  But what amount of

22  time is needed for that process?

23      MS. BAKER:  I think it varies depending on different

24  cities and councils and that type of thing.  The city's

04:53:12  25  intention is to go as quickly as we can to get our approvals,

 1   and they will have to speak to the timing on their end.  And

 2   then, after that, once we are able to lodge with the Court -- of

 3   course, there's a 30-day public comment period.

 4                   And then, I understand that the federal

 5   government tends to address any comments that might be had by

 6   the public.

 7                   THE COURT:  All right.

 8                   All right.  Can you add anything on that,

 9   Mr. Douglas?

10                   MR. DOUGLAS:  Your Honor, this is a pretty significant

11   case and civil action.  So, this is one that, within the

12   Department of Justice, will have to go up to the Associate

13   Attorney General.  So, the process for getting approval.  We

14   would move it as quickly as we can, but it's hard for me to

15   predict what that amount of time would be.

16                   But if the Court said we had "X" number -- 30

17   days or 45 days, I would do everything in my power to make it

18   happen within that time period.

19                   The other thing that I will just add is there is

20   a public participation process for the city, the federal

21   government, and for the state.  So, once -- let's say, all the

22   principals for the city, the federal government, and EPA and the

23   state approved the consent decree that we submit to them, then,

24   the federal government would -- I would lodge that consent

25   decree with the Court.

1          Once it's approved by the managers, I would lodge

2    it with the Court, which means just put it in the Court record

3    subject to a -- we normally do a 30-day public comment period

4    where anybody who knows about the consent decree, sees a notice

04:54:54    5    in the federal register can write a comment and say, "I don't

6    like this about the consent decree" or "I think you did a great

7    job in terms of coming up with these projects."

8          And we would have to respond to those public

9    comments in moving to ask the Court to approve the consent

04:55:11   10    decree.  So, the Court would at some point see what the comments

11    were and how we responded to those.

12          THE COURT:  And then, you leave it to the Court after

13    all of that to determine whether to approve the consent decree,

14    after the comments back and forth have come?

04:55:28   15          MR. DOUGLAS:  Your Honor, in the Clean Water Act

16    context, the law is very clear that, after all the good work of

17    the parties to get to that point of having a consent decree and

18    after the public comment period, it's left to your Honor to

19    review that consent decree, the public comments, and determine

04:55:47   20    that the consent decree meets the requirements of law, which is

21    normally a principle of fairness, reasonable, and consistent

22    with the public interest.

23          And we would have to advise the Court why we

24    believe the consent decree meets those requirements.

04:56:03   25          THE COURT:  All right.  Thank you, sir.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1           Let me ask, Mr. Ledbetter, is -- who for the

2    state needs to make the approval?

3           MR. LEDBETTER:  It's the First Assistant Attorney

4    General for the State of Texas.

04:56:21  5           THE COURT:  It doesn't have to go to the legislature

6    or some other bureau?

7           MR. LEDBETTER:  No, your Honor.  We just have to go

8    through the same comment process.

9           THE COURT:  All right.  Okay.  Thank you, sir.

04:56:30  10          All right.  Now, let's see, Ms. Ice, do you have

11   any questions to ask as the intervenor?

12          MS. ICE:  Yes, your Honor.  Thank you.  I represent

13   Bayou City Waterkeeper which is a local NGO that's concerned and

14   working to protect the city's and the area's waterways and

04:56:49  15   bayous and the water quality.

16          THE COURT:  Yes.

17          MS. ICE:  And so, as -- we were granted the status as

18   an intervenor; and as an intervenor, we were hoping for all the

19   rights that the other parties have had in participating in this

04:57:00  20   -- in resolving the city's wastewater problem.

21          So, I do want to emphasize that Waterkeeper's

22   goal is also to resolve the city's wastewater problems and is

23   committed to working with both the EPA and the state and the

24   city in doing so.  So, we do not intervene, you know, with the

04:57:15  25   intent to interrupt the discussions or the progress that is

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  being made.  And I am very heartened by what I've heard today as
2  far as the progress that has been made.

3        I would like to point out that, from the public's
4  perspective, which is the perspective of Bayou City Waterkeeper,
04:57:30  5  there were years of negotiations where the residents of the city
6  were waiting for news about this proposed agreement that we
7  heard was coming any day, the consent decree; and it was after
8  Harvey hit and there was a stall in those negotiations and those
9  negotiations were not resumed in a timely fashion that
04:57:47  10  Waterkeeper decided to file its notice of intent to sue.

11        THE COURT:  Well, you say it wasn't resumed in a
12  timely fashion.  But this Hurricane Harvey was, you know, such a
13  devastating storm.  I was having a hearing earlier this
14  afternoon where there's so many people like this right now that
04:58:12  15  the lawyer representing this family said they had just now moved
16  back into their house.

17        Their case involves flood insurance, and there's
18  so many thousands -- tens of -- hundreds of thousands, I guess,
19  of people that were just devastated.  I've even seen studies
04:58:32  20  dealing with the psychological impact on the people who were
21  flooded and the serious thing it is.

22        I say that because I'm not sure that I
23  immediately have the same response you did when I hear that
24  Hurricane Harvey with the devastation it did caused these
04:58:57  25  parties to back away for awhile before they resumed their work

1   on this.  But in any event, go ahead and let me hear you out.

2          MS. ICE:  You're absolutely right.  And I apologize if

3   I came off sounding insensitive.  That is not my intent.

4   Waterkeeper's employees and their members are Houston residents

04:59:17  5   who, you know, were affected and are concerned; and our notice

6   letter that we sent identifying the violations that we were

7   concerned about, you know, intentionally left out any violations

8   we thought could be attributed to Harvey, realizing that that

9   was a really extreme event and that the city --

04:59:34  10         THE COURT:  Yes.

11         MS. ICE:  -- you know, was struggling to deal with its

12   people first.

13              So, I absolutely acknowledge that.  The storm

14   also affected the wastewater treatment system, and this has been

04:59:45  15   an issue that was ongoing well before the storm hit.  And the

16   storm also will inform how the city responds in this consent

17   decree knowing that storms like this are going to be more

18   frequent in the future, unfortunately.

19         THE COURT:  Well, how do we know that?

05:00:03  20         MS. ICE:  Well, we have data from NOAA that says that

21   our flood plains are increasing and the intensity of the storm.

22         THE COURT:  Because of the construction there's so

23   much less --

24         MS. ICE:  I think just --

05:00:15  25         THE COURT:  -- open ground?

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          MS. ICE:  I think just because of climate change that

2     the intensity of the storms are going to become more -- more

3     intense and more frequent.

4          THE COURT:  Okay.

05:00:26  5          MS. ICE:  So, I came here today really to hear what --

6     the progress that the parties are making since it was after

7     Bayou City Waterkeeper filed its notice letter that we have

8     heard that the negotiations have been resumed and that they are

9     -- that there is progress being made.

05:00:44  10          Unfortunately, Bayou City Waterkeeper has been

11    kept out of the settlement negotiations.  We don't disagree that

12    settlement is a very positive step here and that litigating

13    would be costly and unnecessary and that settlement is the right

14    way to go and working through this consent decree is the right

05:01:04  15    way to go.

16          But as party to the suit, Waterkeeper would like

17    the ability to participate; and that -- that would be either

18    through litigation or through settlement.  And right now,

19    because of the stay and because the other parties are opposed to

05:01:15  20    Waterkeeper participating in the settlement, it's unable to do

21    either.

22          And as we've heard, the consent decree that has

23    been -- that is being worked on, it is going to be hundred pages

24    or more.  It's going to be dense and highly complex; and it is

05:01:29  25    something that Waterkeeper and its member are very, very

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1   interested in.  As a party to the consent decree, they will, you

2   know, be able to help enforce it; and as an enforcing body, they

3   want to make sure that the consent decree is something that they

4   can work with in the future.

05:01:44   5          And right now, we're left on the outside, as the

6   rest of the residents in the city are, not really knowing what

7   to expect and being told that there's a 30-day public comment

8   period in which we can, you know, make our comments.

9          So, we didn't want to lift the stay.  We don't

05:01:57   10   want to go to litigation necessarily, but that's why we didn't

11   file a request to lift the stay.  And that's, instead, why we

12   filed a request for the status conference.  We're hoping that

13   the parties will include Bayou City Waterkeeper in the

14   discussions now early on so that we don't have to come back to

05:02:12   15   the --

16          THE COURT:  What would City Waterkeeper -- there's

17   only one thing that the principals have left to resolve, both

18   sides have told me; and that's the amount of the fine.  What

19   would City Waterkeeper bring to that conversation that would be

05:02:31   20   of value?

21          MS. ICE:  I don't think that -- I'm not sure that

22   Waterkeeper would have an opinion on the penalty because the

23   penalty would not impact us in any way.  Waterkeeper would be

24   more interested in the terms of the settlement agreement and

05:02:46   25   whether or not it was designed and fully capable to achieve the

1  compliance of the Clean Water Act that the parties I know are

2  seeking.

3          We -- Waterkeeper has done a lot of -- has been

4  analyzing a lot of the data that is publicly available and would

05:03:01  5  like the opportunity to continue to do that and to provide those

6  comments now rather than way later down the road because, as I

7  said, they do want to work with the city towards that common

8  goal.

9          But a shortened timeline during the public

05:03:17  10  comment period for a party that is this interested in all the

11  little details that are going to come out of that consent decree

12  is just simply not enough time.  And this would allow us to talk

13  about those -- to ask those questions and have those

14  conversations ahead of time.

05:03:31  15          So, hopefully, we're not back here in front of

16  the Court, as the parties explained, fighting over the details

17  of the consent decree then; that we can work out some of our

18  differences, if there are any, ahead of time.

19          THE COURT:  Tell me a little bit about the Bayou City

05:03:44  20  Waterkeeper.  Maybe I should know of your company, but it's a

21  new name to me with your introduction into this case.  Is it an

22  engineering firm or --

23          MS. ICE:  Oh, no, your Honor.  It's a non-profit

24  organization whose mission is to protect the water quality in

05:04:04  25  the Galveston area bays and estuaries.

1          THE COURT:  Do they have staffs of employed engineers

2     and the kind of people that the federal -- the EPA has and the

3     city has they've told me about?

4          MS. ICE:  The Waterkeeper is a network, and there are

05:04:25   5     Waterkeepers around the country who will share resources in

6     situations like this.  They -- I do not believe that Bayou City

7     Waterkeeper has an engineer on staff; although, they do have

8     water quality scientists on their board of directors; and a lot

9     of the work that gets done with a small NGO such as this one is

05:04:45  10     done on a voluntary basis through the board of directors or

11     there are allies who like to help out.

12               So, these are folks who are participating in this

13     process because they have a mission to help, you know, clean up

14     Galveston Bay; and they have a lot of friends and members who

05:05:00  15     would also like to help; and that is what -- and they represent

16     their interest in this case.  And so, that is what participation

17     in this would bring to the table, which is a unique interest, I

18     think, than that -- although, there's a line.  It's a unique

19     interest than what the city or the federal or state government

05:05:15  20     bring.

21          THE COURT:  Okay.  All right.  Thank you very much.

22               Well, I might ask Mr. Douglas how the city in

23     turn -- how you feel about what Ms. Ice has said, that she would

24     just like to be in the conversation to see what all these

05:05:35  25     details are?

1          MR. DOUGLAS:  I mean, I'll say two things, your Honor.

2     The game is over.  This is a game where maybe the referee

3     decided to put five seconds on the clock because of something

4     that happened, but the game is over.

05:05:53   5          We have -- and the reason why I went through that

6     history is because I wanted to share with the Court that the

7     City of Houston, the Department of Justice, the State of Texas,

8     EPA have been at this issue since 2013 or before.  We have put a

9     lot of effort into it, and we have come to the end of the game.

05:06:14  10     It's over.  All we have to do now is resolve the penalty issue

11     and convince our managers to approve the consent decree.

12          Now, your Honor, this comes up in most of these

13     Clean Water Act cases where environmental groups attempt to get

14     involved; and the Courts have made very clear that these

05:06:33  15     environmental groups have an ample opportunity to participate in

16     the settlement process because they get a chance to look at the

17     consent decree.  They get a chance to make comments to the

18     governments here, the state, the city, the federal government.

19          They get a chance to make those comments.  They

05:06:51  20     can submit whatever they want.  We will consider that; and in

21     the end, the Court will get a chance to see what concerns

22     Waterkeeper raised or any environmental group, how we dealt with

23     those, and if we were fair in the way that we dealt with those

24     comments.

05:07:08  25          So, as part of the public participation process,

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  Waterkeeper gets a chance to look at everything we have done

2  under the consent decree, offer this Court, offer all three

3  governments their concerns; and then, this Court will get a

4  chance to see what those concerns are.

05:07:26  5           Your Honor, there is -- and if the Court wants,

6  we can brief this issue.  There are a ton of cases that make it

7  very clear that just because you're an intervenor in a case does

8  not give you a right to participate in settlement talks.

9  There's a ton of case law that supports that view.

05:07:44  10          I'll be glad to brief that issue for the Court

11  because those Courts have concluded, as I just said, as part of

12  the public comment period Waterkeeper gets a chance to see

13  everything.

14          Now, I would ask the Court to consider this, too.

05:07:57  15  You asked Ms. Baker the question about who is involved in these

16  discussions.  Well, the federal government, when we have these

17  discussions, there are certain legal issues that I address; but

18  I can't even discuss some of the technical stuff that they talk

19  about in these discussions.

05:08:12  20          We have two well-known nationally recognized

21  experts who are the ones sitting down with the city and with the

22  state talking about some of the measures that have to be taken

23  and why those measures should be taken.  EPA sends an engineer

24  of ten or twelve years of experience to these meetings to

05:08:33  25  represent EPA's interests and to talk about the kind of

1  measures.  These are highly technical discussions.  It takes a
2  lot of work and effort, research to bring all this together and
3  try to make decisions.

4          Your Honor, I think that whether it's Waterkeeper
05:08:50  5  or whether it's John Q. Public on the street, if they have an
6  interest in knowing what we did, they'll get a chance to see
7  that and if they have an interest in communicating --
8  communicating with us in terms of disagreeing with "X" or "Y"
9  and providing support as to why they disagree, that is
05:09:10  10  information that we have to consider as part of going through
11  the process.  And it's not just me.  I have to let my managers
12  know that "X" group raised these concerns.  So, the EPA managers
13  get a chance to see what the comments are, as well.

14          Your Honor, when I first got up, I said the game
05:09:29  15  is over.  The game is truly over in terms of all the hard work
16  that we have put into this.  We have come to a conclusion, and
17  it would be extreme delay on -- in this case if we had to open
18  up discussion or do other things to go backwards in order to
19  convince and show and hear from as opposed to proceeding with
05:09:54  20  this consent decree, being approved by our respective
21  managements, and giving Waterkeeper its entitlement that we give
22  to every other citizen and environment group a chance to
23  participate in the public comment group.

24          In fact, they have three opportunities for public
05:10:14  25  comment.  One, the state has a separate public comment period;

1    and Waterkeeper gets a chance to share their comments with the

2    state, the Attorney General's Office.  Two, the city has a

3    public participation process; and Waterkeeper gets a chance to

4    share its concerns with the city.  The federal government has a

05:10:29    5    separate public participation process.  They get a chance to

6    share their concerns with us.  So, there's ample opportunity for

7    them to tell this Court why they don't like the consent decree,

8    why the Court may want to consider something else.  And that's

9    down the road once we submit the consent decree to the Court for

05:10:49    10    approval.

11        So, there is plenty of time for them to tell this

12    Court that we got it wrong; and the Court should correct it.

13    But I'm convinced that we'll tell the Court we got it right, and

14    the Court should approve the consent decree once we submit that

05:11:04    15    to the Court.

16        THE COURT:  Thank you, sir.

17        Did you have something else to say, Ms. Baker?

18        MS. BAKER:  Yes.  I would agree with Mr. Douglas; and

19    I would just add that the way that the statutory scheme is set

05:11:14    20    up, EPA and the state are the primary enforcers of the Clean

21    Water Act; and while intervenors can come in, their role is not

22    just supplant EPA and the State.

23        So, in this case, you know, the EPA has

24    negotiated these kinds of consent decrees with probably more

05:11:35    25    than hundred cities.  Mr. Douglas himself has negotiated 75

1  complex consent decrees.  The parties each have engaged

2  engineering firms who are specialists in technical engineering

3  about how we solve problems of engineering and moving human

4  waste through millions of miles of pipe in the flattest city

05:11:57  5  around.

6  And so, I -- you know, I echo what he says in

7  that it is complex.  We have negotiated a settlement that we

8  want to recommend to our management.  His management hasn't even

9  seen it yet.  These are confidential settlement negotiations,

05:12:15  10  and they get -- I think they're entitled to see it before it

11  goes out to the public.

12  And the Bayou City Waterkeeper gets the same

13  rights as the rest of the public and all of the other

14  organizations who want clean water and care about the

05:12:28  15  environment.  So, everyone is treated equally.  So, I would just

16  add that.

17  Thank you, your Honor

18  THE COURT:  All right.  Thank you.

19  All right.  Ms. Ice, did you have anything else

05:12:38  20  to add?

21  MS. ICE:  Yes, thank you.  Thank you, your Honor.

22  I would say that it sounds to me as if there is

23  -- if there is an imminent final -- if there is some imminent

24  final language and if it is confidentiality that is holding the

05:12:55  25  parties up from sharing that and simply giving Bayou City

1    Waterkeeper the head start on being able to fully digest what it

2    is that they're proposing that Waterkeeper would be more than

3    happy to sign a confidentiality agreement or enter a protective

4    order so that was something that they could begin reviewing.

05:13:13    5    And I don't see how that would necessarily interrupt the

6    process.

7                 I would also say that I don't think we should

8    discount the -- you know, the public participation aspects and

9    how important that is.  I realize that there are experts here

05:13:26    10    who have been working on this for years and years; but as

11    everyone has noted, it does have to go through City Council and

12    to the mayor.

13                 I would think that they would want the

14    participation of the public, and that's simply what we're here

05:13:40    15    offering and asking for the opportunity to do.

16                 THE COURT:  All right, thank you.

17                 All right.  Well, I thank you all for your very

18    excellent presentations and for informing me, giving me a much

19    better picture of where things stand.

05:14:03    20                 It does seem to me that, given the

21    representations made by Plaintiffs and by Defendant, City of

22    Houston, that the terms have -- of a consent -- a proposed

23    consent decree has been agreed except for this one outstanding

24    item -- and that is, a recommended fine amount to comply with

05:14:37    25    the statutory requirement for fine -- that -- which they hope,

1   both sides, to reach resolution on in the next couple of weeks,

2   it seems to me that after these years of negotiations,

3   investigation, study, all the engineering, the complexities, and

4   the like and the cost I'm sure that go along with that that it

05:15:13   5   would be in the interest of all the parties, I think, as well in

6   the interest of the public interest company that -- Bayou City

7   Waterkeeper, at this time to try to hold that delicate balance

8   and not do anything to upset the apple cart.

9                   Having seen and been a party to some complex

05:15:43   10   negotiations in my years as a lawyer long, long ago, sometimes

11   when you have comprehensive settlements, if one thing changes on

12   one side, then the other side has something else to change.  It

13   has to -- they want to give or they want to take; and then,

14   you're back into a negotiating situation.  If this is to be

05:16:11   15   changed, then what about that?  Or we only agreed to that

16   because we're getting this.

17                   And it seems to me that, from what I have heard

18   described, the complexity, the size of this -- I'm a Houston

19   native.  I know the size of the city geographically, and that's

05:16:37   20   why I questioned how -- the magnitude of this, and I've been

21   duly impressed.

22                   But I can see at this time there -- I am

23   impressed from what has been represented to me by both sides

24   that there's a delicate balance here, and I think it's in the

05:17:00   25   interest of all parties and the public that that be respected

1  and that we see what happens in the next couple of weeks, right

2  in this near term that -- where the parties expect to be able to

3  reach agreement comprehensively.

4            And then, that will set in motion, I assume,

05:17:25  5  where the authorities above, the supervisors, the higher-ups can

6  go ahead; and they'll have all of the recommendations of these

7  lawyers and staffs and engineers and the like who have

8  negotiated this deal to urge approval.

9            I might ask, Mr. Douglas -- I'm a little bit

05:17:49  10  interested in your experience since, obviously, you've done so

11  many of these.  Do you find that the higher-ups in the

12  departments generally go along with your recommended settlements

13  or do you have other experience with that?

14            MR. DOUGLAS:  Your Honor, I started today by saying

05:18:10  15  this is a complicated case; and I can see that, when this goes

16  up the chain, that folks will have questions that I'll have to

17  answer and may have to call upon EPA to help me.  But I think it

18  will be something that we should be able to convince our

19  managers to approve.

05:18:26  20            THE COURT:  Yeah.  But I'm interested about your past

21  experience which is, obviously, considerable.  And that is, have

22  you in the past had success in getting these settlements

23  through?

24            MR. DOUGLAS:  Ms. Baker mentioned San Antonio.  I

05:18:40  25  negotiated the consent decree there involving its clean water --

1  its sewer system.  We got that through the system.  I'm also a

2  manager.  I supervise other lawyers in my section, the

3  Environmental Enforcement Section; and for the most part, these

4  consent decrees -- you write up the recommendation to the upper

05:19:03  5  manager.  You may have to experience or answer some questions;

6  but for the most part, they get approved.

7         THE COURT:  All right, thank you.

8         MR. DOUGLAS:  Once again, this one has to go to the

9  associate.  And we'll have to, you know, speak well to the

05:19:13  10  associate in terms of explaining this consent decree; but I'm

11  optimistic that that will not be a problem.

12         THE COURT:  All right.  Thank you, sir.

13             And I might ask, Ms. Baker, do you have -- you

14  probably don't have experience having to do this.  This seems to

05:19:28  15  be like the one career opportunity for you maybe.  But do you

16  expect the City Hall and the mayor and the City Council to be

17  receptive to your work?

18         MS. BAKER:  I think -- I would expect ultimately the

19  City would be because this is -- we have such a massive system.

05:19:49  20  This is the third or fourth go-round to renew and rehabilitate

21  our system.  They have devoted $3 billion in the last 30 years,

22  and we had more people than ever using our system.  And you

23  know, there is a need.

24         THE COURT:  I assume that throughout this process you

05:20:07  25  have been keeping the mayor advised of all of this?

1          MS. BAKER:  Generally, yes.  The city attorney is

2     certainly my boss.

3          THE COURT:  The city attorney.

4          MS. BAKER:  I keep him directly informed and the

05:20:21   5     director of public works, as well.

6          THE COURT:  Yeah.  Okay.  Thank you.

7          MS. BAKER:  Thank you.

8          THE COURT:  Well, in any event, I feel that that -- at

9     this point, I'm persuaded that there's much optimism on both

05:20:37  10     sides and a delicate balance that I think it would behoof all

11     parties to try to respect.  And I think that as soon as we get

12     the -- what I hope will be soon the positive word that a

13     comprehensive settlement is prepared, then you'll be going up

14     through the channels; and I gather it's then only a matter of

05:21:02  15     time until the document is put out for public -- for everyone.

16     Is that --

17          MR. DOUGLAS:  Your Honor, may I just say that we'll

18     continue to file progress reports.  So, we --

19          THE COURT:  Well, I hope there won't be more --

05:21:18  20          MR. DOUGLAS:  Just to let the Court know things are

21     moving.

22          THE COURT:  Oh, yeah, that's right.  I hope there

23     won't be more progress reports saying that you're still working

24     on the fine.

05:21:27  25          MR. DOUGLAS:  Just to keep the Court informed.

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1          THE COURT:  Okay.  Because I hope you'll have that

2    resolved, both sides.  I don't know where you are, I don't know

3    what it is, or anything else.  But I'm being sold by you on your

4    optimism and buying into that.

05:21:46   5          All right.  But I think that's good to continue.

6    You know, even after that, I certainly want to know how it is

7    and going up the chains of command and so forth; and of course,

8    Ms. Ice will, too, want to know that and when she then can have

9    available for her scientists and specialists on her board to be

05:22:09  10   able to read all of that and provide comments.

11          Okay.  Anything else today?

12    (No response.)

13          THE COURT:  This has been a very good status report by

14    all parties.

05:22:22  15          MR. DOUGLAS:  No, your Honor

16          THE COURT:  You've helped me understand everybody's

17    position so much better.  I thank you for that.

18          Thank you for suggesting it, Ms. Ice.

19          MS. ICE:  Thank you for granting it.

05:22:29  20          THE COURT:  All right.  Thank you.

21          That concludes this hearing then.

22    (Proceedings concluded at 5:22 p.m.)
                         C E R T I F I C A T E
23        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter, to
24    the best of my ability.

25    By: /s/ **Gayle L. Dye**                      03-05-2019
            Gayle L. Dye, CSR, RDR, CRR        Date


                Gayle Dye, CSR, RDR, CRR - 713.250.5582