UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES, | § | CIVIL ACTION NO. 4:18-CV-3368 |
|         Plaintiff, | § | |
| | § | HON. CHARLES R. ESKRIDGE, III |
| STATE OF TEXAS, | § | |
|         Plaintiff, | § | |
| | § | |
| and | § | |
| | § | |
| BAYOU CITY WATERKEEPER, | § | |
|         Plaintiff-Intervenor | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF HOUSTON, | § | |
|         Defendant. | § | |

Bayou City Waterkeeper's Response to Opposed Motion for Entry of Consent Decree
Filed by Plaintiffs United States and State of Texas

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Nature & Stage of the Proceeding ....................................................................... 2

Statement of Facts ................................................................................................ 3

Statement of Issues Requiring Resolution........................................................... 7

Standard of Review .............................................................................................. 7

Summary of Argument ......................................................................................... 9

Argument ............................................................................................................ 10

   1.  By not adequately responding to BCWK's technical comments, the United States
      has hindered this Court's ability to assess the decree .............................. 10

   2.  By refusing to address private laterals, the consent decree falls short of resolving
      impacts to water quality and public health ............................................. 12

   3.  By ignoring environmental injustices, the decree compounds inequities in the
      City's sewer infrastructure, contrary to Title VI ................................... 13

   4.  By contemplating minimal public participation, the consent decree ignores
      Houston's historic failure to engage communities ................................. 15

   5.  The assessed penalty is too low and not offset with local environmental projects or
      other similar benefits .............................................................................. 16

Conclusion .......................................................................................................... 19

Certificate of Word Count .................................................................................. 21

Certificate of Service .......................................................................................... 21

**Exhibits**
Declaration of Jordan E. Macha
Declaration of Dr. Lauren Ross

**Appendix**
*United States v. Miami-Dade Cty., Fla*, No. 12-24400 (S.D. Fla. Apr. 10, 2014) (ECF No. 155)

# TABLE OF AUTHORITIES

## Cases

*Citizens for a Better Env't v. Gorsuch*,
   718 F.2d 1117 (D.C. Cir. 1983) ................................................................. 8, 13

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ........................................................................ 8

*League of United Latin Am. Citizens v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ...................................................................... 7, 8

*Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*,
   504 F.3d 634 (6th Cir. 2007) .......................................................................... 9

*United States v. Akzo Coatings of Am., Inc.*,
   949 F.2d 1409 (6th Cir. 1991) ................................................................ passim

*United States v. Allegheny-Ludlum Indus., Inc.*,
   517 F.2d 826 (5th Cir. 1975) .................................................... 8, 13, 15, 16

*United States v. Cannons Eng'g Corp.*,
   899 F.2d 79 (1st Cir. 1990) ............................................................................ 9

*United States v. City of Akron*,
   794 F. Supp. 2d 782 (N.D. Ohio 2011) ...................................................... 9, 12

*United States v. City of Akron*,
   No. 09-272, 2013 WL 999909 (N.D. Ohio Mar. 13, 2013) ............................ 9

*United States v. City of Miami*,
   664 F.2d 435 (5th Cir. 1981) ................................................................ 7, 8, 14

*United States v. Miami-Dade Cty., Fla*,
   No. 12-24400 (S.D. Fla. Apr. 10, 2014) (ECF No. 155) ................................ 9

*United States v. Telluride Co.*,
   849 F. Supp. 1400 (D. Colo. 1994) ................................................................ 8

**Statutes**

33 U.S.C. § 1251 ..................................................................................................... 9

33 U.S.C. § 1319(d) ............................................................................................... 17

33 U.S.C. § 1365(a)(1) ............................................................................................ 2

42 U.S.C. § 2000d, et seq. ..................................................................................... 14

**Rules**

40 C.F.R. § 7.35 ..................................................................................................... 14

**Other Authorities**

Memorandum from Jeffrey Bossert Clark, Assistant Att'y Gen., Env't and Nat.
  Resources Division, U.S. Dep't of Justice, SEPs in Civil Settlements with Private
  Defendants (Mar. 12, 2020) .......................................................................... 19

U.S. EPA, 2015 Update to the 1998 U.S. EPA SEPs Policy (May 10, 2015) .................. 18

Consent Decree, *United States v. Allegheny Cty. Sanitary Auth.*,
  No. 2:07-CV-737 (W.D. Pa.) ........................................................................ 18

Consent Decree, *United States v. Metropolitan St. Louis Sewer Dist.*,
  No. 4:07-CV-1120 (E.D. Mo.) ...................................................................... 18

Bayou City Waterkeeper ("BCWK") files this response to the Opposed Motion for Entry of Consent Decree Filed by Plaintiffs United States and State of Texas (Doc. 42). BCWK asks the Court to allow limited discovery and hold an evidentiary hearing. Alternatively, the Court should deny the plaintiffs' motion as not fair, reasonable, or in the public's interest.

<u>Introduction</u>

For decades, the City of Houston's ("City") sewer infrastructure has plagued its residents and waterways with thousands of discharges of untreated sewage. These discharges, known as overflows, take many forms. Rainstorms carry hundreds of thousands of gallons of untreated wastewater into Houston's bayous. Raw sewage pools in neighborhood greenspaces and elementary school grounds. Toilets back up into families' homes. Whatever form an overflow takes, it dirties Houston's water, harms public health, and potentially violates the Clean Water Act ("CWA").

In July 2018, BCWK analyzed five years of data and served a notice of intent to sue the City for over 9,000 CWA violations. The United States and State of Texas filed this enforcement action 59 days later and immediately sought a stay. The parties claimed they had been negotiating a consent decree for years, conceding negotiations had lapsed after Hurricane Harvey and did not resume until after BCWK sent its notice letter. As the plaintiffs and City restarted negotiations, they excluded BCWK.

Despite the ubiquitous nature of the City's problems, no efforts were made to consult with the public. Mayor Turner attempted to avoid any public oversight by imposing a punitive secrecy clause on City Council before the decree was final, and the decree

defaults public participation to the legally required comment period. Plaintiffs now ask the Court to approve the consent decree, unchanged by the 80 public comments they received.

If granted, the motion will draw this litigation to a close. The consent decree will mandate needed improvements to Houston's sewer system. But the plaintiffs have not shown this Court that the decree is fair, adequate, reasonable, and in the public's interest, as they must, because:

- The United States did not respond to BCWK's technical comments adequately enough to aid this Court's review;
- By not addressing private laterals, the decree cannot comply with the CWA over the long-term;
- By not addressing environmental injustices in the City's sewer infrastructure, the decree violates civil rights law;
- The decree contemplates minimal public participation, ignoring the City's antipathy toward public engagement; and
- The penalty is too low and not offset by community-centered provisions.

So the parties may address these shortcomings, BCWK asks the Court to allow for limited discovery and hold an evidentiary hearing, or deny the motion.

## Nature & Stage of the Proceeding

This environmental enforcement action arises under the CWA and targets thousands of violations committed by the City across its sewer system. (Docs. 1, 40, 42.)

These problems were left unresolved for years until BCWK served the City with a notice of intent to sue over 9,000 potential CWA violations on July 23, 2018. *See* 33 U.S.C. § 1365(a)(1). Fifty-nine days later, the United States and State of Texas filed this enforcement action and requested an immediate stay. (Docs. 1, 2.) BCWK filed a citizen

2

suit,[1] and in November 2018, the Court allowed BCWK to intervene in this action over the City's objection. (Doc. 20.) While the City negotiated a consent decree with plaintiffs, both lawsuits have been stayed. (*See* Doc. 8.)

On August 27, 2019, plaintiffs lodged a consent decree with this Court, purporting to resolve their action without input from BCWK as intervenor. (Doc. 40.) A required public-comment period followed. On August 7, 2020, plaintiffs asked this Court to enter the consent decree as a final judgment. (Doc. 42.) As explained below, BCWK opposes the motion.

<u>Statement of Facts</u>

The City operates one of the largest separate sewer systems nationwide, with 39 treatment plants and a collection system with over 6,000 miles of pipes and 390 lift stations. (*See* Doc. 42-1 at 5, Affidavit of Alan Vaughn ("Vaughn Aff") at ¶ 3(a),(b).) This sewer system has plagued Houstonians with overflows of untreated sewage for decades. Declaration of Jordan E. Macha ("Macha Decl") ¶ 3. These overflows take many forms: massive discharges of untreated sewage into Houston's bayous during rainstorms, persistent overflows in neighborhood greenspaces, sewage back-ups in individual family homes, and more. *Id.*

Because these discharges violate the CWA and state law, the City has repeatedly entered settlement agreements with regulators over 30 years. Despite spending at least $3

---

[1] *BCWK v. City of Houston*, No. 4:18-CV-3369 (S.D. Tex. filed September 21, 2018).

billion, the City continued to report a similar—sometimes higher—number of unlawful overflows. (Doc. 40-1 at 7 (seventh "Whereas" clause); Doc. 12-2, ¶ 53.)

In 2018, BCWK, a local non-profit organization,[2] analyzed five years of overflows documented by the City. Macha Decl ¶ 4; Declaration of Lauren Ross ("Ross Decl") ¶ 9. In the City's data, BCWK identified more than 9,000 overflows from the City's sewer system from 2013 to 2018. *Id.* This analysis excluded problems with the City's sewer infrastructure caused by Hurricane Harvey, which infused Southeast Texas' already-toxic floodwaters with 31.6 million gallons of sewage, destroyed a City treatment plant, and temporarily closed two more.[3] Macha Decl ¶ 5.

BCWK's review showed, and the consent decree confirms, no single source is responsible for Houston's problems. (*See* Docs. 12-2, 40-1 at 125-44, Appendix E (identifying problems with treatment plants); Vaughn Aff at ¶ 6 (identifying contributing factors).) The City's data attributes overflows to distinct, overlapping causes—localized grease clogs leading to back-ups, heavy rainfall leading to high-volume overflows, faulty work, failing pumps, broken pipes, lack of electricity, untrained employees, and more. (*See* Doc. 40-1 at 125-44; *see also* Vaughn Aff at ¶ 6.)

---

[2] BCWK utilizes science, law, and community empowerment to protect and restore natural systems, achieve equitable policy solutions, and advance systematic change to benefit all who live within the Lower Galveston Bay watershed, which encompasses the greater Houston region. Macha Decl ¶ 2.

[3] Alex Stuckey, Harvey caused sewage spills, Houston Chronicle, (Sep. 19, 2017), available at https://www.houstonchronicle.com/news/houston-texas/houston/article/Harvey-caused-sewage-spills-12213534.php.

Regardless of source, the City's overflows dramatically affect water quality across the region. Nearly every identified stream segment monitored within the City's service area is recognized as impaired by bacteria by federal and state regulators. (Doc. 12-2 at ¶ 52.) An independent analysis found fecal bacteria 75% of the time at local water testing sites and recommended more vigorous enforcement of municipal wastewater standards.[4]

Though these problems are city-wide, lower-income communities and communities of color are "most likely to feel the consequences of Houston's long-running struggle with sewer overflows." Mike Morris, *Sewer spills put city under EPA scrutiny*, Houston Chronicle (Aug. 27, 2016), available at https://www.houstonchronicle.com/news/houston-texas/houston/article/Sewer-spills-put-city-under-EPA-scrutiny-9188683.php; *accord* Ross Decl ¶¶ 18-22, 26.

BCWK's analysis served as the basis of its notice letter served on the City on July 23, 2018. (*See* Doc. 12-2 at 23.) This notice prompted the United States and the State of Texas to file this enforcement action 59 days later on September 20, 2018, targeting an unspecified number of CWA violations over ten years. (Doc. 1.) Plaintiffs immediately sought a stay of all litigation. (Doc. 2.) The parties claimed they had been negotiating a consent decree for years, but conceded negotiations had lapsed for a year and did not resume until after BCWK's notice letter. (*See* Doc. 42 at 3-4.)

---

[4] Environment Texas Research & Policy Center, Swim at Your Own Risk: Bacteria Pollution in Texas Beaches and Waterways Threatens Public Health (2018), available at https://environmenttexas.org/sites/environment/files/reports/TX_Water2018_scrn.pdf.

Over the City's objection, BCWK intervened, (Docs. 12-2, 20), and also filed a citizen suit. *BCWK v. City of Houston*, No. 4:18-CV-3369 (S.D. Tex. filed September 21, 2018). As the parties resumed negotiations, BCWK was repeatedly excluded. Macha Decl ¶ 7. Despite the far-reaching nature of the City's problem, no efforts were made to consult with the public. *Id.* ¶ 8.

On August 27, 2019, plaintiffs lodged a consent decree with this Court, purporting to resolve this action without input from BCWK as intervenor. (Doc. 40.) Shortly after, the U.S. Department of Justice published notice of the decree, triggering a 30-day period for public comment. At BCWK's request, this 30-day period was extended by a month. By November 8, 2019, 80 individuals and organizations submitted comments. (Doc. 42 at 20.)

BCWK's comment letter raised concerns relevant now: BCWK asked the United States to incorporate terms reflecting BCWK's role as intervenor; questioned why the decree did not address specific causes of overflows identified by the City or environmental injustices, including the exclusion of any new requirements to address private laterals; recommended a long-term plan for community engagement to account for the City's past antipathy toward public involvement; and expressed concerns about the penalty, particularly given the decree's exclusion of Supplemental Environmental Projects. (Doc. 42-1 at 88 (summary of comments).) In many cases, BCWK provided draft language to aid the United States' review. (*E.g. id.* at 90-94.)

Eight months passed. The plaintiffs ask the Court to approve the decree, which is unchanged by the 80 public comments received. (Doc. 42 at 25.) In response to BCWK's comments, the United States has asked this Court to order the City to serve BCWK with

all final deliverables required by the consent decree. (*See* Doc. 42-3 at 2.) Otherwise, the United States deflected BCWK's concerns or suggested the City could adopt recommended measures on their own. Ross Decl ¶ 17. For clarity's sake, BCWK's comments and the United States' responses are discussed in detail below where relevant.

Statement of Issues Requiring Resolution

In resolving the plaintiffs' motion, the Court must assess whether the consent decree is fair, adequate, reasonable, and consistent with the public's interest when:

(1) The United States did not respond to BCWK's technical comments adequately enough to aid this Court's review;

(2) The consent decree does not address well-documented problems with private laterals sufficient to resolve CWA violations over the long-term;

(3) The consent decree does not address environmental injustices in the City's sewer infrastructure sufficient to comply with federal law;

(4) The consent decree provides for minimal public participation, ignoring the City's documented antipathy toward public engagement; and

(5) The penalty is too low and does not offset penalty reductions with community-centered projects.

Standard of Review

A consent decree, although founded on the agreement of the parties, is a judgment. *United States v. City of Miami,* 664 F.2d 435, 439 (5th Cir. 1981); *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993). A court "must not merely sign on the line provided by the parties. Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval." *City of Miami*, 664 F.2d at 440-41. Because a decree reflects the court's judgment, this Court must exercise "equitable

7

discretion before accepting litigants' invitation to perform the judicial act." *Clements*, 999 F.2d at 846.

The Court must evaluate whether the decree is "fair, adequate, and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). Before approving the decree, the Court must "satisfy itself of the settlement's overall fairness to beneficiaries and consistency with the public interest." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 850 (5th Cir. 1975); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983). Protecting the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate. *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991).

 Because "the consent decree does not merely validate a compromise, but by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny." *City of Miami*, 664 F.2d at 441. A more searching review is appropriate where, as here, the suit affects the public interest and "the adversary system has yet to function" because the "case was filed merely as the vehicle by which the parties' settlement agreement could receive judicial approval." *United States v. Telluride Co.*, 849 F. Supp. 1400, 1403 (D. Colo. 1994) (distinguishing between long-running litigation and cases where no litigation follows the complaint).

When a lawsuit seeks to enforce a statute, the Court must consider the nature of the litigation, the purposes to be served by the decree, and confirm the decree is consistent with Congressional public objectives. *City of Miami*, 664 F.2d at 441. This requires the Court to determine that the decree is legally and factually reasonable based on the record. *Id.*

Because the CWA's objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251, this Court should consider "the decree's likely effectiveness as a vehicle for cleansing" local waters. *Akzo Coatings*, 949 F.2d at 1437.

When consent decrees do not meet these standards, courts reject them. *See* U*nited States v. City of Akron*, 794 F. Supp. 2d 782 (N.D. Ohio 2011) (rejecting decree representing "little more than an agreement to agree" after nine-year negotiation); *United States v. City of Akron*, No. 09-272, 2013 WL 999909, at *1 (N.D. Ohio Mar. 13, 2013) (rejecting approval because "Court cannot adequately review the Decree absent an expert"); *see United States v. Miami-Dade Cty., Fla*, No. 12-24400 (S.D. Fla. Apr. 10, 2014) (ECF No. 155) (approving decree after amending decree to impose higher penalties); *see also Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d 634 (6th Cir. 2007) (approving decree after initial decree withdrawn to address exclusion of intervenor in several respects).

## Summary of Argument

Despite claiming to negotiate the consent decree for nearly six years, the parties consistently side-lined the public and BCWK. Substantive fairness flows from procedural fairness. See *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 n.4 (1st Cir. 1990). By refusing to engage with the public, the parties negotiated a consent decree that falls short in key respects. The consent decree is not fair, adequate, reasonable, or in the public's interest because:

9

- The United States did not respond to BCWK's technical comments sufficient to aid this Court's review;

- The consent decree does not address well-documented problems with private laterals sufficient to resolve CWA violations over the decree's life;

- The consent decree does not address environmental injustices in the City's sewer infrastructure contrary to federal law;

- The consent decree ignores the City's documented failure to engage communities by providing minimal public participation; and

- The assessed penalty is too low and not offset by supplemental environmental projects or other benefits.

To fully examine these discrete issues, the Court should allow limited discovery and hold an evidentiary hearing. Alternatively, the Court should deny the motion.

<u>Argument</u>

**1. By not adequately responding to BCWK's technical comments, the United States has hindered this Court's ability to assess the decree**

With help from Dr. Lauren Ross, a professional engineer experienced with wastewater systems, BCWK devoted 12 pages of its comments to addressing technical shortcomings of the consent decree. (Doc. 42-1 at 95-101, 115, 116, 137-39.) In responding to these comments, the United States deflected by explaining other aspects of the decree; referenced other plans that are being prepared but which have not been disclosed to the public; or ignored BCWK's comments altogether. These instances include the United States' responses to the following comments:

| Comment | Response |
|---|---|
| **(IV-1) Data purporting to support consent decree is incomplete.** By generally identifying the basis for project prioritization, the decree lacks | The United States misconstrues the comment, then does not respond to it. Rather than discuss data sources informing |

| specificity and transparency, hindering outside assessment of whether it adequately addresses overflows and rendering the decree incomplete. | the decree, the United States discusses injunctive relief measures. |
|---|---|
| **(IV-2) The prioritization matrix misses key factors and does not give sufficient information about other factors like floodplains, and the parties do not explain how it is used.** | The United States raises more questions than it answers; it references sewer basins not mentioned in the decree and discloses no information about these basins; asserts floodplain data will be used but provides no information about how; and asserts that impacts on environmental justice communities need not be included as a prioritization factor because the consent decree incidentally prioritizes some low-income communities of color. |
| **(IV-3) Early Action Projects must be completed more quickly than 10 years.** A timeframe of ten years to complete "Early Action" projects is meaningless. | The United States insists the timeline is quick enough; 78.4 % of the Early Action Projects must be completed by 2025, they say; 16.6 % from 2028 to 2030. |
| **(IV-4) The length for compliance is too long.** This is particularly true since plaintiffs' case involves ten years of past violations. | The United States insists a 15-year timeline is sufficient without adequately explaining why. |
| **(IV-5) The decree does not fully address known causes of pollution.** | Rather than answer the question, the United States points to broader injunctive methods that the consent decree will pursue. |
| **(V-10)    Additional    wet    weather recommendations.** | Plaintiffs reference reports and plans that are not part of the decree and that were not subject to public review or comment. |

*See* Ross Decl ¶ 17; Doc. 42 at 49.

By failing to confront BCWK's comments head-on and leaving many details to be resolved another day, the United States has hindered this Court's role in assessing whether

the decree fairly addresses environmental and public health concerns posed by the City's sewer system. *See Akzo Coatings*, 949 F.2d at 1426 (in evaluating the efforts of an agency charged with making technical judgments and weighing complex data, the court must ensure that the agency has considered all of the relevant evidence in the record); *City of Akron*, 794 F. Supp. 2d at 807-08 (rejecting an "agreement to agree" with a 19-year timeline after 7 years of negotiations).

## 2. By refusing to address private laterals, the consent decree falls short of resolving impacts to water quality and public health

In documenting problems with its sewer system, the City identified clogs from fats, oils, and grease ("FOGs") and other overflows from private sewer laterals as a major cause of SSOs. (*See* Doc. 42-1 at 38.) But plaintiffs disclaim any responsibility on the City's part to address overflows from private laterals. Instead, the decree reiterates existing requirements under Houston's municipal code. (Doc. 42-1 at 40.) The consent decree requires the City to continue educational efforts, tell homeowners to call a plumber, and conduct a follow-up inspection; if the homeowner does not address the problem, the City "may" take enforcement action. (Doc. 40 ¶ 43(g)-(k).)

For years, this approach has failed to reduce overflows, as evidenced by the City's reported high rate of overflows associated with private laterals. Ross Decl ¶ 26. When private laterals age, they face the same problems as the City's infrastructure; they degrade, crack, are infiltrated by floodwaters, or are broken by underground roots. *Id.* ¶ 23. Sewage leaks from these laterals, leading to back-ups inside of private property and sending

untreated sewage and potential pathogens into waterways, streets, homes, and businesses. *Id.* ¶ 24.

Repairs to private laterals are extremely costly and out of the reach of low-income and even moderate-income Houstonians. *Id.* The decree's approach means that residents who cannot afford to repair their sewer lines are forced to live with unhealthy sewage problems and face financial penalties. *See id.*

To protect human health and water quality, the City must address private laterals, particularly in low-income and historically marginalized communities. *Id.* at ¶ 26. By merely incorporating the City's existing legal options which have failed to resolve this problem for years, the decree is unfair, unreasonable, and not in the public's interest. *See Akzo Coatings*, 949 F.2d at 1437 (in assessing reasonableness of CWA decree, court should consider "likely effectiveness as a vehicle for cleansing" local waters); *Allegheny-Ludlum Indus.,* 517 F.2d at 850 (court must confirm "settlement's overall fairness to beneficiaries"); accord *Citizens for a Better Env't*, 718 F.2d at 1126 (D.C. Cir. 1983).

### 3. By ignoring environmental injustices, the decree compounds inequities in the City's sewer infrastructure, contrary to Title VI

Understanding that lower-income communities of color are the "most likely to feel the consequences of Houston's long-running struggle with sewer overflows,"[5] BCWK's comments presented solutions ignored by the decree. (Doc. 42-1 at 99-100, 115-21.)

---

[5] Mike Morris, *Sewer spills put city under EPA scrutiny*, Houston Chronicle (Aug. 27, 2016), available at https://www.houstonchronicle.com/news/houston-texas/houston/article/Sewer-spills-put-city-under-EPA-scrutiny-9188683.php.

Instead of explaining how the decree addresses environmental injustices, the United States emphasized the system-wide benefits of planned repairs, noting that the decree focuses on some geographic areas that are coincidentally home to low-income Houstonians. (Doc. 42-1 at 32.) Rather than reflecting intentionality, this assessment of environmental justice occurred after-the-fact. (Vaughn Aff ¶ 8.) Plaintiffs seem to disclaim any obligation to assess environmental injustices at all—and worse, shift the burden to BCWK to complete this analysis, after repeatedly excluding BCWK from negotiations. (*See id.*; Macha Decl ¶ 7.) Regardless, BCWK has confirmed this trend in the City's more recent data; further, neither the decree nor planned Capital Improvement Projects account for these disparities. Ross Decl ¶¶ 21, 25.

The United States must ensure the City complies with Title VI of the Civil Rights Act of 1964, which prohibits the spending of federal funds in a manner that discriminates on the basis of race, color, or national origin, either intentionally or in a way that has discriminatory effects. 42 U.S.C. § 2000d, et seq; 40 C.F.R. § 7.35. A consent decree may properly include provisions requiring the defendant to take affirmative action rectifying the effects of past discrimination. *City of Miami*, 664 F.2d at 442.

The City's sewer program has received, and will continue to receive, federal funding through various grant programs, including the Clean Water State Revolving Fund. *See, e.g.*, Underground Construction, *Nearly $74 Million Awarded for Texas Water and Sewer Projects*, April 16, 2018, available at https://ucononline.com/news/2018/04/nearly-74-million-awarded-for-texas-water-and-sewer-projects. Whether discrimination is present in a decree that aims to address decades of overflows goes directly to this Court's

consideration of whether the decree is fair to its beneficiaries and consistent with the public interest. The post-hoc analysis of the planned system-wide repairs was not designed to eliminate discriminatory effects of the City's public works programs or rectify effects of the City's past discrimination. Rather than support it, the flawed rationale calls into question the procedural and substantive fairness of the decree. *See id.*; *Allegheny-Ludlum*, 517 F.2d at 850 (assessing overall fairness to beneficiaries and consistency with public interest); *Akzo Coatings*, 949 F.2d at 1435 (assessing fairness includes examining effects on nonparties to consent decree).

### 4. By contemplating minimal public participation, the consent decree ignores Houston's historic failure to engage communities

BCWK's comments highlighted the City's failure to engage residents in decisions affecting them. (Doc. 42-1 at 127-37.) This resistance to community involvement pervaded the decree's negotiation. Macha Decl ¶¶ 7-18. At every turn, the City rejected the notion that Houstonians should have input into the consent decree, apart from the federal comment period, when key provisions were already set in stone. *See id.* And the City repeatedly resisted having BCWK's involvement in the decree's negotiation. *Id.* ¶¶ 6-7. In responding to these concerns, the United States emphasized: "Nothing in the Decree would preclude the City from working with residents and community members in this fashion…." (Doc. 42-1 at 65.)

This misses the point. BCWK asked for community engagement as a requirement because ***the City will not do this on its own***. Macha Decl ¶¶ 7-18. To illustrate, the Mayor planned to put the consent decree up for a vote without releasing a copy to the public, *id.* ¶

8, and City Council Members were subject to a punitive "secrecy clause" preventing them from sharing information about the consent decree with the public. *Id.* ¶ 13.

Only after more than 50 groups and individuals voiced concerns over the $billion closed-door settlement, the Mayor released a copy while delaying Council's vote by only six days. *Id.* ¶ 9. Despite the short turnaround, BCWK, working with other organizations, presented the City with a community engagement plan, which was rejected by the Mayor's office, and the Council approved the decree without changes. *Id.* ¶ 10, 11, 13.

The City later took the position that it had adequately consulted with the public by pointing to these Council meetings, as well as actions taking place after the Council's vote, including the federal (not the City's) comment period and the City's presentations to closed, paying audiences. Macha Decl ¶ 12. This level of outreach falls short of ensuring ratepayers and those most affected by the City's pollution have any understanding of the consent decree and the City's wastewater investments moving forward. *Allegheny-Ludlum*, 517 F.2d at 850 (assessing overall fairness to beneficiaries and consistency with the public interest); *Akzo Coatings*, 949 F.2d at 1435 (assessing fairness includes examining decree's effects on nonparties). Because the decree does nothing to make up for the City's lackluster engagement, it is not in the public's interest.

### 5. The assessed penalty is too low and not offset with local environmental projects or other similar benefits

BCWK's lawsuit identifies more than 9,000 overflows over five years. Covering an unspecified number of violations over ten years, the plaintiffs' lawsuit purports to be broader.

Each overflow represents a discrete potential violation of the CWA and is subject to a separate, mandatory penalty. 33 U.S.C. § 1319(d). For the period covered by BCWK's intervention and citizen suit, penalties ranged from $37,500 to $53,484 per day, per violation. (Doc. 12-2 at 26-27, ¶ 86.) For illustrative purposes, based on the violations in BCWK's citizen suit, the City could be liable for hundreds of millions of dollars in penalties; in this enforcement action, the penalty would be higher. Though plaintiffs concede they likely would prevail on liability on summary judgment for thousands of legal violations over more than ten years (Doc. 42 at 22), the decree requires the City to split only $4.4 million in penalties between the U.S. Treasury and Texas' General Revenue Fund. (Doc. 40 at ¶ 47.)

To suggest that the City's penalty is appropriate, the plaintiffs assert it "will represent the highest civil penalty assessed against a municipality for sewer system related violations." Doc. 42-1 at 42, Affidavit of James Zinny at ¶ 4. This is misleading for two reasons. First, by limiting their statement to "municipalities" they disregard consent decrees entered by other local sewer system operators. Second, this ignores that unlike the City, municipal defendants receive penalty reductions in exchange for funding Supplemental Environmental Projects ("SEPs").

SEPs are projects that defendants undertake to benefit local communities affected by pollution in exchange for reducing penalties owed for environmental violations. U.S. EPA, 2015 Update to the 1998 U.S. EPA SEPs Policy, at 6 (May 10, 2015). Historically, SEPs have been a powerful tool to directly redress some environmental harms endured by the communities affected by a legal violation. *Id*. at 24.

17

Other local sewer authorities with smaller service areas have paid similarly high penalties when their SEPs are taken into account. In 2007, the Allegheny County Sanitary Authority, serving Pittsburgh and 82 surrounding municipalities with a smaller service area and population than Houston, paid a $1.2 million penalty for past CWA violations, and agreed to spend at least $3 million on SEPs—collectively only $200,000 shy of the City's commitment here (without adjusting for inflation), which does not dedicate any funds to SEPs. Consent Decree at ¶¶ 110, 116, *United States v. Allegheny Cty. Sanitary Auth.*, No. 2:07-CV-737 (W.D. Pa.), available at https://www.epa.gov/sites/production/files/2013-09/documents/alcosan-cd.pdf.

In 2011, the Metropolitan St. Louis Sewer District, also with a smaller service area and population than the City, paid a $1.2 million penalty and agreed to invest at least $1.6 million in SEPs to address private lateral repairs and other problems, for $2.8 million total. Consent Decree at ¶¶ 78, 80, 82(a), *United States v. Metropolitan St. Louis Sewer Dist.*, No. 4:07-CV-1120 (E.D. Mo.).

More important, these examples show when a penalty reduction is warranted: when a decree contemplates SEPs. Although the City announced in a press statement that the decree would include a SEP "to replace defective private sewer lines in a low-income area of the City where laterals have caused or contributed to SSOs at no cost to the homeowners,"[6] the parties' sluggish negotiations likely thwarted those plans. From 2017

---

[6] How is the City Addressing Thousands of Sewage Overflows? Houston Public Media (Aug. 16, 2018) (quoting from City of Houston press statement), available at https://www.houstonpublicmedia.org/articles/shows/houston-matters/2018/08/16/300159/how-is-the-city-addressing-thousands-of-sewage-overflows/.

to 2020, the Department of Justice issued a series of policies that chipped away at, then ended, its decades-long policy to prevent the use of SEPs in nearly all circumstances. *See* Memorandum from Jeffrey Bossert Clark, Assistant Att'y Gen., Env't and Nat. Resources Division, U.S. Dep't of Justice, SEPs in Civil Settlements with Private Defendants, at 2 (Mar. 12, 2020). The effect is important: Protracted negotiations led to a penalty reduction for the City, but avoided any community-oriented projects.

Low-income residents should not bear the burden of the parties' delays in negotiating a consent decree. Because liability is indisputably strong, the plaintiffs should have required the City to undertake additional planning to resolve problems with its sewer system not directly addressed by the consent decree—for example, more creative terms to aggressively address overflows from private laterals, or community engagement for the life of the consent decree to offset the City's historic failures at public outreach.

Without any such terms, the decree is not fair or in the public's interest. *See Akzo Coatings*, 949 F.2d at 1435 (in assessing fairness, court should consider strength of plaintiff's case and from standpoint of nonparties).

Conclusion

To fully examine the deficiencies raised by this response, BCWK asks the Court to allow limited discovery and hold an evidentiary hearing. Alternatively, the Court should deny the plaintiffs' motion as not fair, reasonable, or in the public's interest. (Doc. 42).

19

Respectfully submitted,

*/s/ David Frederick*
David Frederick
Attorney-in-charge
Texas Bar No. 07412300
Eric Allmon, of counsel
Texas Bar No. 24031819
Lauren Ice, of counsel
Texas Bar No. 24092560
Frederick, Perales, Allmon & Rockwell, P.C.
1206 San Antonio St.
Austin, Texas 78701
Tel: 512-469-6000
Fax: 512-482-9346
dof@lf-lawfirm.com
eallmon@lf-lawfirm.com
lauren@lf-lawfirm.com
Attorneys for Bayou City Waterkeeper

Kristen Schlemmer, of counsel
Texas Bar No. 24075029
S.D. Tex. Bar No. 2078411
Bayou City Waterkeeper
2010 N. Loop West, Suite 103
Houston, TX 77018
Tel: 713-714-8442
kristen@bayoucitywaterkeeper.org
Attorney for Bayou City Waterkeeper

Certificate of Word Count

Excluding the caption, table of contents, table of authorities, signature block, and certificates, this response contains 4,980 words and is within the 5,000 word limit contained in Rule 18(c) of this Court's procedures.

/s/ David Frederick
David Frederick
Attorney for BCWK

Certificate of Service

I certify that on September 4, 2020, I electronically filed this document and all attachments using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ David Frederick
David Frederick
Attorney for BCWK

21